IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| FREDDIE J. BORDERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION |
| v. ) | No. 07-2188-KHV |
| ) | |
| ARCH ALUMINUM & GLASS CO., INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |

### MEMORANDUM AND ORDER

Freddie J. Borders sues his former employer, Arch Aluminum & Glass Co., Inc. ("Arch Aluminum") for race discrimination in violation of Title VII, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. § 213.010 et seq. and the Kansas Act Against Discrimination ("KAAD"), K.S.A. § 44-1001 et seq. This matter comes before the Court on Defendant Arch Aluminum & Glass Co., Inc's Motion For Summary Judgment (Doc. #44) filed March 12, 2008. For reasons stated below, the Court finds that defendant's motion should be overruled.

### Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A "genuine" factual dispute

requires more than a mere scintilla of evidence. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which he carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on his pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the [party] opposing the motion for summary judgment." Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. Anderson, 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

## Facts

Plaintiff Freddie Borders is an African-American male. Plaintiff worked for Arch Aluminum as a truck driver from September 2, 2003 through February 3, 2006. Plaintiff reported to Bob

Naylor, a Caucasian, who worked as a dispatcher for Arch Aluminum. Naylor reported to the branch manager, who was Scott Bridges up to September of 2005 and Doug Couch from September of 2005 through July of 2007.

Beginning in December of 2003, Arch Aluminum assigned plaintiff the route from Kansas City, Kansas to St. Louis, Missouri. Each work day, plaintiff drove a loaded truck of glass from Kansas City to a meeting point near St. Louis, where he switched trucks with the St. Louis driver and drove back to Kansas City.

Plaintiff exchanged trucks with Keith Rothenberg from September 2, 2003 to June 7, 2004, Dale Moore from June 14, 2004 to January 7, 2005 and Gary Kromat from January 26, 2005 to February 3, 2007. Each of those drivers complained that plaintiff arrived late to the drop-off location.

Naylor testified that when plaintiff started driving the St. Louis route (in December of 2003), he went from being a good employee who arrived on time to an employee who was habitually late and not performing. In December of 2004, however, plaintiff's performance appraisal stated that he was a "five star employee" as to quantity of work, that he was always on time and completed his work in a timely manner. On September 30, 2005, plaintiff's performance appraisal contained no negative comments.

Other employees directed racist comments and actions at plaintiff. Moore told plaintiff that "we don't need a Black President" and "a Black President would get killed." See Plaintiff's Depo. at 88-89, attached as Ex. E to Memorandum In Support Of Arch Aluminum & Glass Co., Inc.'s Motion For Summary Judgment ("Defendant's Memorandum") (Doc. #45) filed March 12, 2008. Moore wore hats with confederate flags when he drove his truck. On one occasion, plaintiff found

a Noose tied onto the truck which Moore exchanged with him.[1]  Plaintiff did not complain about Moore to anyone at Arch Aluminum.

Plaintiff believes that Kromat discriminated against him because Kromat called management to complain that plaintiff arrived late to the drop-off location and asked plaintiff to arrive at the drop-off location at a certain time.  On June 10, 2005, Kromat and plaintiff got into a yelling match because Kromat claimed that plaintiff had arrived late.

Plaintiff believes that Naylor engaged in racist conduct toward him.  Naylor referred to plaintiff as "boy."  Id. at 110-120, 125.  Naylor understands that the term "boy" can be offensive to African-Americans.  Once, when an alarm went off, plaintiff told Naylor that he was worried that police were going to come and find a black man in the building.  Naylor replied, "Well, why don't you just put a sheet on and you don't have to worry about it, you know."

Plaintiff kept notes about conduct which he considered race discrimination against him at Arch Aluminum.  See Notes, attached as Ex. M to Defendant's Memorandum (Doc. #45).  The notes reference the following events: (1) a confrontation with Kromat about being late; (2) a confrontation with Moore; (3) Naylor telling plaintiff where he could park; (4) Naylor asking plaintiff to help make deliveries on the St. Louis route; (5) Rothenberg failing to tell him about a flat tire on a trailer which they exchanged; (6) Moore placing a noose on a truck which he exchanged with plaintiff; (7) Moore wearing a cap with a confederate flag and (8) Naylor commenting that plaintiff should wear a sheet if police officers searched the Arch Aluminum facility.  In December of 2004 or January of 2005, plaintiff accidentally left the notes on a desk at Arch Aluminum.  Naylor found them and referred

---

[1] At one point plaintiff attributed the incident to Moore because Moore pointed out the noose and plaintiff believed that Moore was the only one with access to the truck.  Naylor testified that he also found a noose on his truck.

the matter to Bridges, who was Branch Manager at that time. Plaintiff initially denied that the notes belonged to him, but he eventually told Bridges about the incidents in his notes. Plaintiff felt that Bridges, who is African-American, took his claims seriously and conducted an investigation.

In January of 2005, Kromat became the St. Louis driver. On several occasions, Kromat called Naylor to complain that plaintiff had arrived late at the drop-off location. Naylor tried to informally address the issue by talking to plaintiff about the importance of arriving on time. In late 2005 or early 2006, Naylor told Kromat and plaintiff to call when they arrived at the drop-off location. Plaintiff believes that Arch Aluminum required him to check in with his supervisor because he was African-American and Arch Aluminum did not want him to have the Kansas City to St. Louis route.

On January 17 and 25, 2006, plaintiff failed to call when he arrived at the drop-off point. On each day, Naylor verbally warned plaintiff that he needed to call. On January 26, 2006, however, plaintiff did not call and Couch gave him a written warning which stated that "Freddie has been told to call Bob Naylor upon arrival of his first stop to meet Gary Kromat. He has been warned but still fails to call in." See Ex. H to Defendant's Memorandum (Doc. #45).[2] Plaintiff signed an acknowledgment that he had read the counseling report and understood it. See id. Plaintiff did not look at the document because he was frustrated when he signed it, and he does not recall reading the document. Plaintiff's Depo. at 178-80, attached as Ex. Q to Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment ("Plaintiff's Memorandum") (Doc. #48) filed April 11, 2008. Plaintiff admits, however, that he forgot to call in several times.

---

[2] The written warning indicated that on January 17 and January 25, 2006, Naylor verbally warned plaintiff that he "failed to follow policy." Plaintiff does not recall whether he received verbal warnings on those dates.

On February 3, 2006, Couch terminated plaintiff's employment and completed a "Termination Record" which states as follows:

> Freddie refuses to call when he arrives in St. Louis. He has been warned verbally twice and in writing once. Freddie called in late twice this week and did not call today at all.

See Termination Record, attached as Ex. K to Defendant's Memorandum. Plaintiff does not remember whether he called in late twice during the week of his termination.[3]

Couch called the Director of Human Resources (Ed Rivas) for advice, but claims that he alone made the decision to terminate plaintiff's employment. Couch Declaration, attached as Ex. L to Defendant's Memorandum at ¶ 2. Rivas, however, testified that he "gave the okay" to fire plaintiff. See Rivas Depo. at 111-12, attached as Ex. R. to Plaintiff's Memorandum. Couch told plaintiff that Arch Aluminum was terminating his employment because he did not call when he arrived at the drop-off location. After Arch Aluminum terminated plaintiff's employment, Paul Baker, another African-American driver, took over the St. Louis route.

Plaintiff testified that Kromat told him that he had also failed to call in "a few" or "a couple of times."[4] Plaintiff testified that Kromat could not have been disciplined for failing to call in

---

[3] Plaintiff received a copy of Arch Aluminum's Employee Handbook, which prohibits discrimination and explains how to report discrimination. Plaintiff understood that if he had a claim of discrimination, he could report it to the company. Arch Aluminum's Human Resources Director, Ed Rivas, participated by phone when Couch gave plaintiff the written warning on January 26, 2006. Plaintiff told Rivas that he thought the warning was because of his race and he felt that he was being treated differently. Rivas and Couch asked plaintiff to discuss his concerns or put them in writing, but plaintiff declined to do so. Other than plaintiff's comments on January 26, 2006, plaintiff never complained to Couch about race discrimination or other unfair treatment. On approximately February 8, 2006, Rivas returned plaintiff's phone call to one of Arch Aluminum's owners, Rick Silverstein, regarding alleged race discrimination. Despite several inquiries from Rivas, plaintiff said that he did not want to discuss allegations of race discrimination.

[4] Defendant asserts that plaintiff's deposition testimony that Kromat told him that he (continued...)

because Kromat never told him about any discipline. In its reply, Arch Aluminum points to evidence that Kromat called every day without counseling or reminders and that Naylor never disciplined Kromat concerning the call-in procedure.

## Analysis

Plaintiff claims that defendant terminated his employment because of race in violation of Title VII, 42 U.S.C. §2000e et seq., 42 U.S.C. §1981, the MHRA and the KAAD.[5] Defendant seeks summary judgment, asserting that plaintiff cannot establish a prima facie case of discrimination and that in the alternative, plaintiff has not presented sufficient evidence for a reasonable jury to find that defendant's legitimate, nondiscriminatory reasons for termination are a pretext for race discrimination.

I.      Prima Facie Case

To establish a prima facie case, plaintiff must show that (1) he belonged to a protected class;

---

[4](...continued)
failed to call in a few times is inadmissible hearsay. Under the Federal Rules of Evidence, hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Because plaintiff presents his testimony to prove the truth of the matter asserted – that Kromat did not call in on a few occasions – the evidence is not admissible unless it meets an exclusion or exception to the hearsay rule. Defendant asserts that Kromat's statement is not an admission by a party opponent because Kromat is an hourly employee, holds no management role and cannot act as an agent for Arch Aluminum. But under Rule 801(d)(2)(D), Fed. R. Civ. P., a statement by a party's servant concerning a matter within the scope of employment, made during the existence of the relationship, is not hearsay. Viewed in a light most favorable to plaintiff, the record supports a conclusion that Kromat's statement concerned a matter within the scope of his employment (the call-in requirement) and that he made it during the existence of the employment relationship.

[5]     The standards are the same for Title VII and the KAAD. See Carreno v. IBEW Local No. 226, No. 89-4083-S, 1990 WL 159199 (D. Kan. Sept. 27, 1990) (district court applied Title VII standards to KAAD claim because Kansas courts have done so). Likewise, the same analysis applies to Title VII and MHRA claims. See Tapp v. St. Louis Univ., 78 F. Supp.2d 1002, 1017 (E.D. Mo. 2000); Kehoe v. Anheuser-Busch, 96 F.3d 1095, 1101 n.8 (8th Cir. 1996). Accordingly, the Court applies Title VII standards to plaintiff's claims under the KAAD and the MHRA.

(2) he was qualified for his position; (3) he was discharged; and (4) the discharge occurred under circumstances which give rise to an inference of unlawful discrimination. See Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005). Defendant challenges the fourth element, i.e. whether plaintiff can show that the discharge occurred under circumstances which give rise to an inference of discrimination. Courts have identified a variety of circumstances which can give rise to an inference of discriminatory motive, including:

> actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus, . . . preferential treatment given to employees outside the protected class, . . . in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees . . . or a pattern of recommending the plaintiff for positions for which she is not qualified [or over-qualified] and failure to surface plaintiff's name for positions for which she is well-qualified. A plaintiff might also rely upon the fact that the defendant, following plaintiff's termination, continued to seek applicants to fill the position, . . . or, more generally, upon the timing or sequence of events leading to plaintiff's termination.

Id. at 1101 (quoting Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996)).

Plaintiff asserts that the following facts show that the termination occurred under circumstances which suggest discrimination: (1) defendant required plaintiff and Kromat to check in with Naylor; (2) defendant fired plaintiff for failing to check in with Naylor; and (3) defendant did not discipline Kromat, who also failed to check in with Naylor on at least a few occasions. These facts, viewed in a light most favorable to plaintiff, meet his *de minimus* burden to show that the termination occurred under circumstances which give rise to an inference of unlawful discrimination. See id.

II.   Pretext

Defendant contends that it terminated plaintiff's employment because he did not call Naylor when he arrived at the drop-off point as required. Because defendant has articulated a legitimate

nondiscriminatory reason for the discharge, the burden shifts to plaintiff to present evidence from which a reasonable jury might conclude that defendant's proffered reason is pretextual, that is "unworthy of belief." Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995)). Plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted). While "[t]his burden is not onerous . . . it is also not empty or perfunctory." Id. at 1323-24. A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, i.e. unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff. See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000). More specifically, evidence of pretext may include "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria." Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1328 (10th Cir. 1999).

Plaintiff points to his own testimony that Kromat, who also reported to Naylor, failed to call in and was not terminated. Evidence that the same manager terminated plaintiff and took no disciplinary action against an unprotected employee who violated the same work rule may in some

circumstances create a genuine issue of material fact as to pretext.  See Kendrick, 220 F.3d at 1231.  Here, defendant gave plaintiff verbal warnings for failing to call in on January 17 and 25, 2006.  On January 26, defendant gave plaintiff a written warning for failing to call in that day.  The following week, plaintiff called in late on two occasions and did not call at all on one occasion (February 3, 2006).  Thus, plaintiff failed to call in or called in late on six days over the course of three work weeks.  The record contains evidence that Kromat did not call in on at least a few unspecified days.  The call-in requirement began in late December of 2005 or early January of 2006, so Kromat's failures to call occurred over a period of five or six week or less.  Plaintiff has produced evidence that he and Kromat violated the same work rule, and that Arch Aluminum fired plaintiff but did not even discipline Kromat.  This differing treatment of plaintiff, an African-American, and Kromat, a Caucasian, raises an inference of discriminatory intent.

In addition, plaintiff asserts that evidence of racial animus by Naylor – who reported the rule violations to Couch – helps to demonstrate that defendant's reason for discharge is unworthy of belief.  Plaintiff points out that Naylor frequently called him "boy" and told him to wear a sheet if police came to search the building.  Use of the term "boy" may be evidence of discriminatory animus.  See Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006) (speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom and historical usage); see also Rea v. Martin Marietta Corp., 29 F.3d 1450, 1454 (10th Cir. 1994) (for remark to be probative of discriminatory intent, plaintiff must demonstrate nexus between alleged discriminatory statements and defendant's adverse decision).

The Tenth Circuit has acknowledged that a defendant may be liable if the manager who discharged plaintiff acted as a rubber stamp, or the "cat's paw," for a subordinate employee's

prejudice, even if the manager lacked discriminatory intent. See Kendrick, 220 F.3d at 1231 (citing Long v. Eastfield Coll., 88 F.3d 300, 307 (5th Cir. 1996); Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051, 1057 (8th Cir. 1993); Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir. 1990)); see also Lust v. Sealy, Inc., 383 F.3d 580, 584-85 (7th Cir. 2004) (where subordinate feeds false information to decision maker, subordinate's prejudices imputed to decision-maker). Plaintiff argues that on this record, a jury could find that Couch acted as a rubber stamp for Naylor's prejudice. Cf. Shager, 913 F.2d at 406 (evidence that supervisor who recommended termination expressed animosity toward older workers and exaggerated plaintiff's performance deficiencies sufficient to withstand motion for summary judgment). Specifically, plaintiff points to evidence that Naylor reported to Couch when plaintiff failed to call in, and that Couch disciplined plaintiff for not calling. Further, Kromat failed to call in but Couch did not discipline him. This evidence allows an inference that Naylor reported plaintiff's failure to call in but did not report Kromat's failure to call. See Kendrick, 220 F.3d at 1231. Based on evidence of racial animus by Naylor, a jury could find that defendant's proffered reason for terminating his employment was a pretext for discrimination. Defendant therefore is not entitled to summary judgment.

**IT IS THEREFORE ORDERED that** Defendant Arch Aluminum & Glass Co., Inc's Motion For Summary Judgment (Doc. #44) filed March 12, 2008 be and hereby is **OVERRULED**.

Dated this 26th day of June, 2008 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge